[DO NOT PUBLISH]

# In the
# United States Court of Appeals
# For the Eleventh Circuit

_____

No. 21-10267

_____

BLANCA MARISOL MONCADA,
BEATRIZ MARISOL CASTRO-MONCADA,

                                                                      Petitioners,

*versus*

U.S. ATTORNEY GENERAL,

                                                                      Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A208-778-595

_____

**ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES**

Before JILL PRYOR, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Blanca Marisol Moncada and her daughter, Beatriz Marisol Castro-Moncada, petition for review of a decision from the Board of Immigration Appeals affirming an immigration judge's denial of Moncada's application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). Previously, we dismissed the petition, concluding that we lacked jurisdiction because Moncada had not raised the issues in her petition before the Board and thus failed to exhaust her administrative remedies. The United States Supreme Court granted certiorari, vacated our opinion, and remanded for further consideration in light of its decision in *Santos-Zacaria v. Garland*, 143 S. Ct. 1103 (2023). Upon remand, we conclude that we have jurisdiction to review the petition, but we deny it on its merits.

## I.

Both Moncada and Beatriz are citizens of Honduras who entered the United States in 2015. After entering the country, they were charged with being removable as noncitizens present in the United States without having been admitted or paroled. *See* 8 U.S.C. § 1182(a)(6)(A)(i). In their immigration proceedings, Moncada and Beatriz conceded removability.

Moncada applied for asylum, withholding of removal, and CAT relief. She alleged that she suffered past persecution and had a well-founded fear of future persecution based on membership in a particular social group, "mothers of females that are of child-bearing age claimed by men in transnational criminal organizations." AR at 196.[1] Beatriz is a derivative beneficiary of her mother's claims; she did not file her own application.

In her application and at a hearing before an immigration judge, Moncada described how a man named Eduardo, a member of the MS-13 gang, began pursuing Beatriz, her teenage daughter. Moncada understood Eduardo to be dangerous and someone who would not take no for an answer. Eduardo once showed Moncada's son, Fernando, tattoos that he said represented individuals whom he had killed because they had refused his advances on members of their family. In addition, gang members who previously extracted monthly bribes from Moncada's business told her they were not going to request a bribe; rather, they said, "[w]e want your daughter." *Id.* at 140.

Eduardo also communicated his desires regarding Beatriz through a woman named María José Montalván. Montalván made repeated harassing phone calls to Beatriz on Eduardo's behalf. Once, Montalván told Moncada that she knew where Moncada's bank was, where her children went to school, that her husband was living in Miami, and on which days the family went to church.

---

[1] "AR" refers to the administrative record.

Montalván and Eduardo also came to Moncada's house and screamed obscenities and Beatriz's name while throwing beer bottles at the family's front door. They threatened to burn down the house if Beatriz did not come out and leave with them. Moncada did not report any of these incidents to police.

The day after Montalván and Eduardo came to the home, Moncada and Beatriz, fearing for their safety, fled. They went to San Pedro Sula, another city in Honduras, to stay with extended family. But they did not feel safe in San Pedro Sula because the MS-13 gang controlled that city as well. After two days in San Pedro Sula, Moncada and Beatriz left Honduras and made their way to the United States.

When Moncada and Beatriz left for the United States, Fernando initially stayed in Honduras. Then, fearing Eduardo, Fernando, too, came to the United States. He stayed in the United States for two or three months before returning to Honduras to care for his pregnant girlfriend.

At the hearing before the immigration judge, Moncada testified that she believed that if she and Beatriz returned to Honduras, Eduardo would carry out his threats directed at Beatriz. She explained that she was especially afraid because of her own experience as a victim of sexual violence in Honduras. Approximately 20 years earlier, a man named Luis had drugged and raped her. Although Moncada reported the rape to police, no action was taken. As a result of the sexual assault, she became pregnant with Fernando.

Moncada testified that after the rape, Luis continued to threaten her. When Fernando was three years old, Luis was jailed for sexually abusing the child. But Luis was released from jail after about 10 months. He later became a police officer and continued to threaten Moncada and her family.

The immigration judge denied Moncada's application for asylum, withholding of removal, and CAT relief. He expressed concerns about Moncada's credibility based upon her demeanor while she testified and because of inconsistencies in her testimony. The immigration judge nevertheless found her testimony to be "overall credible," saying that he was giving her "the benefit of the doubt." *Id.* at 54.

For the asylum claim, the immigration judge found that Moncada had failed to meet her burden to establish that she had been the victim of past persecution or that she had a well-founded fear of future persecution in Honduras. He concluded that the threats Moncada faced did not rise to the level of persecution, noting that Eduardo and Montalván had not physically harmed Moncada. And because Moncada had not reported to law enforcement Eduardo's and Montalván's threats, the immigration judge concluded that she had failed to establish that Honduran authorities would be unwilling or unable to protect her. The immigration judge also determined that Moncada had failed to show that she could not safely relocate to another part of Honduras.

Further, even if the threats amounted to persecution, the immigration judge found that Moncada had not shown that the

threats were made on account of a protected ground. The immigration judge considered Moncada's proposed particular social group: mothers of females that are of child-bearing age claimed by men in transnational criminal organizations. He concluded that this proposed group was not a valid particular social group and also that Moncada was not necessarily targeted because of her membership in that group. The immigration judge considered that Moncada's proposed social group also could be described as a family kinship—a different protected ground—but concluded that Moncada still was not entitled to relief. He explained that Moncada was not threatened because she was Beatriz's mother but, instead, because she had resisted Eduardo's attempts to take Beatriz.

The immigration judge also found that Moncada had failed to establish a well-founded fear of future persecution on account of a protected ground. She had not established that she would be harmed "on account of" her membership in a particular social group. *Id.* at 60. Instead, any harm would arise "from the fact that she would be viewed as a person who would try to impede" Eduardo's attempts to approach Beatriz and that "any person, family or otherwise, who would try to do the same thing would probably face the same consequences." *Id.*

Given that Moncada had not met the standard for asylum, the immigration judge determined that she also had failed to demonstrate eligibility for withholding of removal. In addition, she was ineligible for CAT relief because she had failed to establish that it was more likely than not that she would be tortured with the

consent or acquiescence of Honduran authorities upon her return to that country. Although Luis had previously raped Moncada, the immigration judge noted that the incident had occurred more than two decades ago. And even though Luis had continued to threaten Moncada, he had not acted on these threats. The immigration judge also concluded that Moncada had failed to establish that it was more likely than not that she would be tortured by Eduardo and Montalván if she returned to Honduras because "these individuals had never physically harmed" her in the past. *Id.* at 62.

But even if Moncada could establish that it was more likely than not that she would be tortured in Honduras, the immigration judge found that she had failed to establish that authorities in Honduras would acquiesce to this mistreatment. Because Moncada had not reported any of the incidents involving Eduardo and Montalván to the police, the immigration judge concluded that "the authorities in Honduras . . . could not be deemed to have acquiesced to such potential physical mistreatment." *Id.* at 63. In addition, because police had arrested and detained Luis for several months after he sexually abused a child, the immigration judge found that authorities in Honduras were not "totally indifferent to crime" and would take some action to protect Moncada. *Id.*

Moncada appealed to the Board. The only argument she raised in the appeal was that the immigration judge had erred in determining that she had failed to "establish[] past persecution and fear of future persecution." *Id.* at 10.

The Board affirmed the immigration judge's decision. It agreed with the immigration judge that Moncada had failed to "establish that any past harm that she suffered and that she fears she will suffer in the future was or will be on account of her membership in a valid particular social group, family or kinship ties, or any other ground protected by" the Immigration and Nationality Act. *Id.* at 3. Because Moncada's asylum and withholding of removal claims failed on this ground, the Board found it "unnecessary" to consider the other aspects of the immigration judge's decision. *Id.* at 4. The Board further determined that Moncada had not established that, if returned to Honduras, it was more likely than not that she would experience torture with the consent or acquiescence of the Honduran government.

Moncada and Beatriz petitioned this Court for review. They argue that the Board erred in finding that Moncada had not (1) established a nexus between the threats Moncada received and her particular social group and (2) shown that it was more likely than not that she would be tortured with consent or acquiescence of the Honduran government.

In a previous decision, a panel of this Court concluded that we lacked jurisdiction to consider the petition. *See Moncada v. U.S. Att'y Gen.* (*Moncada I*), No. 21-10267, 2022 WL 1090937 (11th Cir. Apr. 12, 2022) (unpublished). We stated that we lacked "jurisdiction to consider a claim raised in a petition for review unless the petitioner has exhausted her administrative remedies by presenting that claim to the [Board]." *Id.* at *2. Because "Moncada did not

argue before the [Board] either that the harm she suffered or feared would be on account of her membership in her asserted social group, or that it was more likely than not that she would be tortured with the consent or acquiescence of the Honduran government," we concluded that she failed to exhaust her administrative remedies as to these issues and thus we lacked jurisdiction to consider them. *Id.* at *3. We dismissed the petition.[2] *Id.*

After we issued our decision in *Moncada I*, the Supreme Court held that the statutory requirement that a noncitizen must exhaust administrative remedies before challenging an order of removal in court is not jurisdictional. *See Santos-Zacaria v. Garland*, 598 U.S. 411, 413 (2023). The Supreme Court then vacated our decision in *Moncada I* and remanded the case for further consideration in light of *Santos-Zacaria*. Upon remand, the parties submitted supplemental briefs addressing *Santos-Zacaria*.

## II.

"We review the decision of the Board." *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1350 (11th Cir. 2009) (internal quotation marks omitted). We review the decision of the immigration judge only "to the extent that the Board expressly adopted" the immigration judge's opinion. *Id.* (internal quotation marks omitted). We review *de novo* the Board's conclusions of law. *Id.* And we review its factual determinations under a substantial evidence standard,

---

[2] We also denied the petition to the extent that Moncada challenged findings of the immigration judge that the Board did not adopt. *See Moncada I*, 2022 WL 1090937, at *3.

which requires us to "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1026–27 (11th Cir. 2004) (en banc). Findings of fact may be reversed "only when the record compels a reversal." *Id.* "[T]he mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." *Id.*

### III.

We begin by addressing our jurisdiction to review the petition. The Immigration and Nationality Act provides, in relevant part, that a "court may review a final order of removal only if" the noncitizen "has exhausted all administrative remedies available . . . as of right." 8 U.S.C. § 1252(d)(1). We previously "interpreted this provision as a jurisdictional bar on review of removal challenges not raised before the" Board. *Kemokai v. U.S. Att'y Gen.*, 83 F.4th 886, 891 (11th Cir. 2023). But the Supreme Court in *Santos-Zacaria* recently held that this exhaustion requirement is not jurisdictional, but rather, it is a claim-processing rule. 598 U.S. at 419. *Santos-Zacaria* thus abrogated our prior precedent treating the exhaustion requirement as jurisdictional. *See Kemokai*, 83 F.4th at 891 (recognizing the abrogation). Accordingly, even if Moncada and Beatriz failed to exhaust their administrative remedies, we have jurisdiction to review their petition.[3]

---

[3] Although § 1252(d)(1)'s exhaustion requirement is not jurisdictional, we must enforce the requirement when the government properly raises it. *See Fort*

## IV.

In their petition, Moncada and Beatriz primarily raise two challenges to the Board's decision. First, they argue that substantial evidence does not support the Board's conclusion that Moncada failed to establish a sufficient "nexus" between the threats from Eduardo and Montalván and Moncada's membership in a valid particular social group. Second, they say that substantial evidence does not support the Board's determination that Moncada failed to show that it was more likely than not that she would experience torture with the consent or acquiescence of the government if she returned to Honduras. We consider each issue in turn.

### A.

An undocumented immigrant who is present in the United States may apply for asylum. 8 U.S.C. § 1158(a)(1). The government has the discretion to grant asylum if an applicant establishes that she is a "refugee." *Id.* § 1158(b)(1)(A). A refugee is a person "who is unable or unwilling to return to" her country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A).

---

*Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1849 (2019). But, as a claim-processing rule, the exhaustion requirement "may be waived or forfeited." *Hamer v. Neighborhood Hous. Servs. of Chi.,* 583 U.S. 17, 20 (2017). Here, the government has expressly forfeited any reliance on the exhaustion requirement.

To be eligible for asylum, an applicant must, "with specific and credible evidence," show "(1) past persecution on account of a statutorily listed factor" or "(2) a well-founded fear that the statutorily listed factor will cause future persecution." *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006) (internal quotation marks omitted). Persecution is an "extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation," and "mere harassment does not amount to persecution." *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1231 (11th Cir. 2005) (alteration adopted) (internal quotation marks omitted).

In addition, an applicant must satisfy the nexus requirement, meaning she must prove that the persecution was, or would be, "on account of a protected basis." *Perez-Sanchez v. U.S. Att'y Gen.*, 935 F.3d 1148, 1158 (11th Cir. 2019) (internal quotation marks omitted). "[T]o satisfy the nexus requirement, an applicant must establish [her] membership in a particular social group was or is 'at least one central reason' for [her] persecution." *Id.* (quoting 8 U.S.C. § 1158(b)(1)(B)(i)).

A central reason is one that "is essential to the motivation of the persecutor." *Sanchez-Castro v. U.S. Att'y Gen.*, 998 F.3d 1281, 1286 (11th Cir. 2021) (internal quotation marks omitted). "In other words, the protected ground cannot play a minor role in the [applicant's] past mistreatment or fears of future mistreatment. That is, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm." *Id.* (internal quotation marks omitted). Evidence that merely shows that a person has been the victim of

crime or private violence does not establish persecution based on a statutorily protected ground. *Ruiz*, 440 F.3d at 1258.

Moncada and Beatriz argue that substantial evidence does not support the Board's determination that Moncada failed to satisfy the nexus standard. They say that Moncada established the requisite nexus because Eduardo and Montalván targeted her because of her familial relationship with Beatriz.

In previous cases, we have analyzed the nexus requirement when a petitioner claims membership in a family-based particular social group. In *Sanchez-Castro*, an El Salvador citizen petitioned for review of the denial of her asylum claim in which she asserted that gang members targeted her family based on the assumption that her father's work in the United States had made her family wealthy. 998 F.3d at 1283–84. We held that substantial evidence supported the Board's decision that the petitioner failed to satisfy the nexus requirement because the gang targeted her family to obtain money, not because of any animus against the family. *Id.* at 1286–87. In doing so, we distinguished persecution because of membership in a family from persecution for some other, tangential reason: "Where a gang targets a family only as a means to another end, the gang is not acting because of who the family is; the identity of the family is only incidentally relevant." *Id.* at 1287; *see Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1310–11 (11th Cir. 2013) (concluding that petitioner failed to establish nexus for his family-based particular social group).

We also considered the nexus requirement in connection with a family-based particular social group in *Perez-Sanchez*. In that case, Perez-Sanchez, the applicant, was threatened, beaten, and extorted by members of a cartel in Mexico. 935 F.3d at 1150–51. Perez-Sanchez's father-in-law owed a debt to the cartel because he had lost a shipment of cocaine belonging to the cartel. *Id.* Years after the cocaine was lost, cartel members tracked down Perez-Sanchez and demanded that he provide information about his father-in-law's whereabouts. *Id.* Perez-Sanchez had no information about his father-in-law, who had long ago abandoned the family. *Id.* at 1151. Members of the cartel nevertheless beat Perez-Sanchez, saying that "because [] Perez-Sanchez's father-in-law owed them money, Perez-Sanchez did as well." *Id.* The cartel then required Perez-Sanchez to make payments to the cartel every month. *Id.*

After fleeing to the United States, Perez-Sanchez applied for asylum and withholding of removal. *Id.* at 1151–52. But the Board denied the application, concluding that "Perez-Sanchez's relationship to his father-in-law played only an incidental role in the cartel's decision to persecute him." *Id.* at 1158 (internal quotation marks omitted). We held that substantial evidence did not support the Board's decision because "[a]bsent the familial relationship between [] Perez-Sanchez and [his father-in-law], the cartel would never have hunted [Perez-Sanchez] . . . down to begin with or continued persecuting [him] for months." *Id.* We concluded that it was "impossible to disentangle [Perez-Sanchez's] relationship to his father-in-law from the Gulf Cartel's pecuniary motive," saying they were "two sides of the same coin." *Id.* We explained that the record

was "replete" with evidence that the cartel had targeted Sanchez-Perez "*because* of his father-in-law's past history with the cartel." *Id.* (emphasis in original). Because the record compelled us to conclude that the familial relationship was a "central reason" for the persecution, we granted his petition. *Id.* at 1158–59.

After considering our precedent, we cannot say that the record compels a conclusion that Moncada satisfied the nexus requirement. Certainly, the record reflects that Eduardo and Montalván threatened Moncada after she tried to shield Beatriz from Eduardo. And it is also true that Beatriz is Moncada's daughter. But we agree with the government that, based on the record, a factfinder could conclude that "any individual, [whether] related or not [to Beatriz], would likely face the same treatment if he or she were to interfere with Eduardo's advances." Respondent's Br. 16–17. As a result, we cannot say that the record compels a conclusion that Moncada's familial relationship was one central reason why she was, or would be, targeted or threatened. *See Sanchez-Castro*, 998 F.3d at 1283. We thus conclude that substantial evidence supports the Board's decision that Moncada was ineligible for asylum and withholding of removal. *See id.* at 1286 (recognizing that applicant who could not meet nexus standard for asylum was "necessarily ineligible" for withholding of removal).[4]

---

[4] In their petition, Moncada and Beatriz also challenge other findings the immigration judge made in analyzing the asylum claim, including whether Moncada safely could relocate to other parts of Honduras. But the Board did

**B.**

Moncada and Beatriz also petition for review of the Board's decision denying CAT relief, arguing that substantial evidence does not support the Board's finding that Moncada failed to establish that it was more likely than not that she would experience torture if she returned to Honduras.

To qualify for CAT relief, an applicant must "establish that it is more likely than not that . . . she would be tortured if removed to the proposed country of removal." *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1242 (11th Cir. 2004) (internal quotation marks omitted). The torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* (internal quotation marks omitted). Acquiescence "requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Id.* (internal quotation marks omitted). A government does not acquiesce to torture when it "actively, albeit not entirely successfully, combats the alleged torture." *Lingeswaran v. U.S. Att'y Gen.*, 969 F.3d 1278, 1294 (11th Cir. 2020) (internal quotation marks omitted). We thus have held that the record did not compel a conclusion that a government would acquiesce in torture

---

not adopt these factual findings, and they "do[] not form any part of the order currently under review." *Lopez v. U.S. Att'y Gen.*, 504 F.3d 1341, 1344 (11th Cir. 2007). To the extent that the petition seeks review of the immigration judge's findings that the Board has not adopted, we deny the petition.

when there was evidence of country conditions showing the country had attempted to curb torture. *See id.*

Here, Moncada and Beatriz argue that "substantial evidence does not support the agency's findings as to acquiescence." Petitioners' Br. 25. They say that if Eduardo harmed Moncada in the future, the Honduran government would take no action to help her because the police and government have been "infiltrated by gangs," noting there is an "overall unwillingness to protect victims of gang violence." *Id.*

Moncada's testimony at the evidentiary hearing certainly shows that she does not trust the police in Honduras to help her if she were threatened or harmed in the future. But because Moncada did not report any of the incidents involving Eduardo and Montalván to the police, there is no evidence showing that the police would take no action if she made a report. In addition, the record includes evidence of country conditions detailing the Honduran government's efforts to combat the corruption about which Moncada complains, including by removing or suspending corrupt police officers. Because the record reflects that the Honduran government is actively taking steps to combat the alleged corruption, we cannot say that the record compels a conclusion that the government would acquiesce in any future harm to Moncada. *See Lingeswaran*, 969 F.3d at 1294. We thus conclude that substantial evidence supports the Board's denial of Moncada's application for CAT relief.

V.

For the reasons set forth above, we deny the petition.

**PETITION DENIED.**